**FOR PUBLICATION**

Order Filed on October 16,
2017 by Clerk, U.S. Bankruptcy
Court - District of New Jersey

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| In re: | : | |
| | : | CHAPTER 7 |
| JOSEPH T. GUARRACINO and | : | |
| YVETTE L. GUARRACINO, | : | |
| | : | CASE NO.:    14-30441 (SLM) |
| Joint-Debtors. | : | |
| _____ | : | |
| | : | |
| ALLIANCE SHIPPERS, INC., | : | |
| | : | ADV. NO.:    14-02069 (SLM) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| JOSEPH T. GUARRACINO, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**OPINION**

**A P P E A R A N C E S :**

Ronald Horowitz, Esq.
2561 Moody Beach Blvd. Route 100
Flager Beach, FL 32136
*Attorneys for Plaintiff, Alliance Shippers, Inc.*

Alla Kachan, Esq.
Law Offices of Alla Kachan, P.C.
3099 Coney Island Avenue, 3rd Floor
Brooklyn, NY 11235
*Attorneys for Defendant, Joseph T. Guarracino*

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

Before the Court is a Complaint filed by Plaintiff, Alliance Shippers, Inc. ("**Alliance**")

against Defendant/Debtor, Joseph T. Guarracino ("**Defendant**"), seeking to determine the non-

dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(4).  Alliance brought this action, in its

capacity as an assignee of a debt arising from a statutory trust, pursuant to the Perishable

Agricultural Commodities Act ("**PACA**"), 7 U.S.C. § 499a, *et seq.*  Defendant denies liability for

the debt and argues that Alliance lacks standing as a creditor or as a PACA trust beneficiary to

collect the debt from Defendant.  This Court conducted a trial, at which time the Court reserved

on the decision and requested post-trial submissions.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(b),

and the Standing Order of Reference from the United States District Court for the District of New

Jersey dated July 23, 1984 and amended September 18, 2012.  This matter constitutes a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).  Venue is proper under 28 U.S.C.

§ 1409(a).  Pursuant to Fed. R. Bankr. P. 7052, the Court issues the following findings of fact and

conclusions of law.[1]

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### *Krisp-Pak Supplies Garden Fresh Produce with Produce*

Defendant was the sole owner, shareholder, and operator of GFP Distributors, Inc. t/a

Garden Fresh Produce ("**GFP**"), a PACA-licensed wholesale produce merchant with a principal

place of business located at 36 East Wesley Street, South Hackensack, New Jersey.  Defendant

---

[1] To the extent any of the findings of fact might constitute conclusions of law, they are adopted as such and vice versa.

was in the wholesale produce business for thirty years.  Defendant operated GFP for approximately

twenty years supplying produce to various customers in the Tri-State area.  At all relevant times,

GFP purchased wholesale produce from Krisp-Pak Sales Corp. ("**Krisp-Pak**"), a wholesale

produce supplier licensed under PACA.  Defendant testified that GFP deposited the money it

received from the sale of produce purchased from Krisp-Pak into a GFP company bank account.

Defendant testified that he had the sole authority to write checks from the GFP bank account and

to authorize the use of account proceeds.  Defendant testified that GFP struggled financially over

the last four to five years it was doing business.  As a result, Defendant regularly used sale

proceeds, including those derived from sales of Krisp-Pak's produce, to pay GFP's business

expenses.  Specifically, Defendant testified he authorized the use of Krisp-Pak sale proceeds to

pay rent for GFP's facility, insurance on its vehicles, and wages for its employees.

### *Krisp-Pak Ceases to Do Business*

In or around 2012, Krisp-Pak went out of business.  At that time, GFP owed Krisp-Pak

$292,444.20 (the "**Debt**")[2] related to the produce GFP purchased from Krisp-Pak between April

2010 and July 2010.  (Invoices, Trial Ex. P-4).  Each invoice from Krisp-Pak to GFP contained

the following language:

> [t]he perishable agricultural commodities listed on this invoice are
> sold subject to the statutory trust authorized by Section 5(c) of the
> Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499
> (e)(c)).  The seller of these commodities retains a trust claim over
> these commodities, all inventories of food or other products derived
> from these commodities and any receivables or proceeds from the
> sale of these commodities until full payment is received.  In the
> event of the enforcement of our trust claim, Krisp-Pak will seek to
> recover reasonable attorney's fees and the costs of recovery.
> Interest at the rate of 1.5% per month, added to unpaid balance,
> interest and attorney's fees necessary to collect any balance owed

---

[2] As the facts will later demonstrate, the state court entered an Execution Order (Trial Ex. 3) and a default judgment
(Trial Ex. 6) requiring that GFP pay Alliance $292,444.50; however, Alliance's Complaint (Docket No. 1) and
Alliance's *Proof of Claim* (Claims Register, Claim 5-1) list the amount owed as $292,444.20.

hereunder shall be considered sums owing in connection with this
transaction under the PACA trust.

(Invoices, Trial Ex. P-4).

Defendant testified that he made certain weekly payments to Krisp-Pak toward the Debt.

However, Defendant could not recall when exactly the payments were made, or in what amounts.

Nor did Defendant provide any evidence to support his assertion.

### *Krisp-Pak Owes Money to Alliance and Alliance Obtains Court-Ordered Assignment of GFP's Debt to Krisp-Pak*

Alliance is a national freight transportation company with its headquarters in Englewood

Cliffs, New Jersey.   At all relevant times, Alliance and Krisp-Pak had a long-term business

arrangement where Alliance would transport produce purchased by Krisp-Pak from the West Coast

to Krisp-Pak's facility located in New York.   When Krisp-Pak went out of business in 2012, it

owed Alliance approximately $370,000.00 for unpaid transportation services.   On March 23, 2012,

Alliance instituted an action against Krisp-Pak to recover that debt in the Superior Court of New

Jersey, Middlesex County, Law Division, No. L-2024-12.   (State Court Complaint, Trial Ex. P-1).

On June 14, 2012, the Superior Court entered a default judgment against Krisp-Pak and in favor

of Alliance in the amount of $369,700.00, together with pre-judgment interest in the amount of

$1,067.68, counsel fees, and other costs.   (June 14, 2012 Default Judgment, Trial Ex. P-2).

During post-judgment discovery, Krisp-Pak produced information to Alliance regarding

accounts receivable owed to it by various customers.   One such account belonged to GFP, which

owed Krisp-Pak $292,444.20.   (Invoices, Trial Ex. P-4).   Alliance then applied to the state court

for an order in aid of execution of judgment against Krisp-Pak.   By Order entered on February 13,

2013, the state court, among other things, ordered GFP to pay Alliance—instead of Krisp-Pak—

the sum of $292,444.50 (the "**Execution Order**") (Execution Order, Trial Ex. P-3).   The Execution

Order also enjoined Krisp-Pak from receiving payment of the money that GFP owed to it. (*Id.*).

Lastly, the Execution Order transferred Krisp-Pak's "rights and credits" against GFP to Alliance

and authorized Alliance to "liquidate the rights and credits in appropriate proceedings." (*Id.*).

### *Alliance Sues GFP and Defendant in State Court and Obtains a Default Judgment*

Thereafter, on July 21, 2014, Alliance initiated a second action in the Superior Court of

New Jersey, Middlesex County, Law Division against GFP and several other account debtors of

Krisp-Pak that failed to comply with the state court's previous Execution Order (*Alliance Shippers,*

*Inc. v. Casa De Campo Inc. et al.*, L-2650-13/ J-155860-12). (Fourth Amended Complaint, Trial

Ex. P-5). Alliance named Mr. Guarracino, both "individually and as an agent of GFP Distributors,

Inc. t/a Garden Fresh Produce," as a defendant in that action. (*Id.*). On November 1, 2013, the

state court entered a default judgment in the sum of $292,444.50 against GFP and against

Defendant, individually and as an agent of GFP. (November 1, 2013 Judgment, Trial Ex. P-6).

### *Defendant Files for Bankruptcy and Alliance Sues for Non-Dischargeability*

On October 6, 2014 (the "**Petition Date**"), Defendant, along with his spouse, Yvette L.

Guarracino, filed a voluntary joint petition under Chapter 7 of Title 11 of the United States Code

(the "**Bankruptcy Code**"). (Case No. 14-30441). Alliance filed a *Proof of Claim* against

Defendant in the amount of $292,444.20. (*See* Claims Register, Claim No. 5-1). On November

17, 2014, Alliance filed the instant Complaint against Defendant, only. (Complaint, *Alliance*

*Shippers, Inc. v. Joseph T. Guarracino*, Adv. Case No. 14-02069, Docket No. 1). The Complaint

contains one Count, which seeks to determine the non-dischargeability of Alliance's claim

pursuant to Section 523(a)(4) of the Bankruptcy Code. (*Id.*). The Complaint further states that

the Execution Order transferred Krisp-Pak's rights to pursue Defendant for the Debt to Alliance.

(*Id.*, ¶ 11).

6

The Complaint alleges that, at the time GFP and Defendant received and accepted produce from Krisp-Pak, Krisp-Pak became a beneficiary in a statutory trust created by operation of law under PACA. (*Id.*, ¶ 18). The Complaint alleges that Krisp-Pak preserved its interest in the trust by delivering invoices to GFP containing the requisite statutory language under PACA. (*Id.*, ¶ 19). The Complaint further alleges that the payment terms prescribed by the invoices expired and GFP failed to pay Krisp-Pak any portion of the aggregate amount due and owing for the produce it purchased from Krisp-Pak. (*Id.*, ¶ 20). The Complaint alleges that Defendant breached his fiduciary duties under the trust by failing to ensure that GFP made payments to Krisp-Pak. (*Id.*, ¶¶ 15, 16 and 21). The Complaint seeks entry of a judgment determining that the entire Debt owed by Defendant, in the sum of $292,444.20, is non-dischargeable pursuant to Section 523(a)(4). The Complaint also seeks an award of counsel fees and costs of suit.

On February 3, 2015, Defendant filed an *Answer* to the Complaint. (Docket No. 5). On July 18, 2016, the Court entered a *Joint Order Scheduling Pretrial Proceedings and Trial* (the "**Scheduling Order**"). (Docket No. 16). The Scheduling Order set a trial date for October 20, 2016. (*Id.*, ¶ 8). The Scheduling Order also provided that all non-discovery-related motions must be filed no later than August 19, 2016. (*Id.*, ¶ 2). The trial date was subsequently adjourned to November 10, 2016. On November 9, 2016, the day before trial was scheduled to begin, Defendant filed a *Motion for Summary Judgment*. (Docket No. 23). Defendant also requested an adjournment of the trial date. On November 10, 2016, immediately before the trial was scheduled to begin, the Court determined that Defendant's *Motion for Summary Judgment* was untimely filed because it violated the plain terms of the Scheduling Order. Further, Defendant never made a request to the Court to modify the Scheduling Order. The Court proceeded to conduct the trial, at the conclusion of which the Court reserved decision and requested post-trial submissions from the parties.

On December 2, 2016, Defendant filed a *Post-Trial Statement*. (Docket No. 26). Without citing any case law, Defendant contends that Alliance lacks standing to collect the Debt owed to Krisp-Pak and disputes whether Defendant can be held individually liable under PACA. In addition, Defendant argues Alliance presented no evidence that Krisp-Pak was licensed under PACA or that Krisp-Pak was even entitled to the PACA protections that Alliance claims were assigned to it.

On December 5, 2016, Alliance filed a post-trial letter brief containing proposed findings of fact and conclusions of law. (Docket No. 27). Alliance contends that Defendant, as a PACA licensee, had a fiduciary obligation to hold in trust the money it received from the re-sale of produce Krisp-Pak supplied to it. Alliance asserts that Defendant breached his fiduciary obligations by instead using those funds to pay other business and personal expenses. Alliance stated that, under PACA, individuals in a position to control payment to suppliers are individually liable when the business fails to make those payments. Alliance contends Defendant was fully aware of his rights and obligations under PACA because he had sole check writing authority and decision-making authority with respect to the use of sale proceeds. Alliance asserts Defendant is personally liable for the Debt as required by PACA, and that the Debt is non-dischargeable pursuant to Section 523(a)(4) of the Bankruptcy Code. Alliance further contends that it has a right to seek payment from Defendant for the Debt based upon the Execution Order, which assigned those PACA rights from Krisp-Pak to Alliance.

## **DISCUSSION**

### *PACA*

Congress enacted PACA in 1930 to promote fair trading practices in the shipping, handling, and marketing of perishable agricultural commodities in interstate commerce. *Consumers*

8

*Produce Co., Inc. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377-78 (3d Cir. 1994); *Am.*

*Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 36 (2d Cir. 2004).   In enacting

PACA, Congress especially intended to protect "small farmers and growers who were vulnerable

to the practices of financially irresponsible buyers."  *Idahoan Fresh v. Advantage Produce, Inc.*,

157 F.3d 197, 199 (3d Cir. 1998).   Thus, PACA requires produce buyers to make full and prompt

payments upon receiving goods from sellers. 7 U.S.C. § 499b(4); *Idahoan Fresh*, 157 F.3d at 199.

Failure to make prompt payments triggers civil liability and the possible revocation of the buyer's

PACA license required by 7 U.S.C. § 499c.  *See* 7 U.S.C. § 499e(a); *see also* 7 U.S.C. § 499h(a).

In the early 1980's, Congress decided to re-examine PACA with the belief that produce

sellers needed even greater protection from defaulting buyers.  *Am. Banana Co., Inc.*, 362 F.3d at

37.  As explained by the Second Circuit:

> Congress noted that, as a result of the exigencies of the perishable
> commodities business, sellers were typically required to sell their
> produce quickly and frequently found themselves in the position of
> unsecured creditors of buyers whose creditworthiness could not be
> verified. If buyers defaulted, sellers could look only to the
> commodities (which would have perished) or to the sales proceeds
> of the commodities. Since sellers were typically unsecured creditors,
> they generally stood in line behind banks and other lenders who had
> obtained security interests in the defaulting purchaser's inventories,
> proceeds, and receivables. As a result, sellers were often unable to
> collect monies owed to them. *See* 7 U.S.C. § 499e(c)(1); H.R. Rep.
> No. 98–543, at 3–4 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405,
> 406–07; *Endico Potatoes*, 67 F.3d at 1067; *JSG Trading Corp. v.
> Tray–Wrap, Inc.*, 917 F.2d 75, 77 (2d Cir.1990). Congress viewed
> this instability as a burden on commerce and contrary to the public
> interest. *See* 7 U.S.C. § 499e(c)(1); H.R. Rep. No. 98–543, at 4–5
> (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 408.

*Am. Banana Co., Inc.*, 362 F.3d at 37.

To provide further protections to sellers of perishable commodities, in 1984, Congress

amended PACA to include a floating trust provision. 7 U.S.C. § 499e(c).  Under this provision, "a

buyer's produce, products derived from that produce, and the proceeds gained therefrom are held

in a non-segregated, floating trust for the benefit of unpaid suppliers who have met the applicable statutory requirements." *Idahoan Fresh*, 157 F.3d at 199 (citing 7 U.S.C. § 499e(c); 7 C.F.R. § 46.46(b)).   Thus, Section 499e(c) of PACA requires licensed dealers to hold all perishable commodities purchased, as well as sale proceeds, in trust for the benefit of unpaid sellers, until the seller receives full payment.   Further, under PACA, the produce seller's claim for payment has a higher priority than the buyer's perfected, secured creditors. *Id.* at 199.   In order to be eligible for PACA trust benefits, the seller must satisfy a notice requirement by either: (1) notifying the buyer within thirty days of default or any time after the seller realizes payment has been dishonored; or (2) including a statutory statement referencing the trust on its invoices, which illustrate the seller's intent to preserve trust benefits.   7 U.S.C. § 499e(c)(3), (4); 7 C.F.R. § 46.46(c), (f).   A seller loses its PACA trust benefits if it fails to give the required written notice in invoice statements or if the seller agreed to payment terms beyond thirty days. *See Idahoan Fresh*, 157 F.3d at 204-05.

Courts in several jurisdictions have utilized a liberal standard when determining if a supplier complied with PACA's notice requirements. *See, e.g.*, *In re W.L. Bradley Co, Inc.*, 75 B.R. 505, 511-12 (Bankr. E.D. Pa. 1987) (interpreting PACA liberally in favor of the seller in finding that notice to the buyer to preserve PACA benefits did not have to occur after default of the buyer); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 782-83 (8th Cir. 1991) (noting that PACA should be interpreted liberally and holding that the produce seller's letter and invoices provided sufficient notice to preserve PACA trust benefits against buyers); *In re Carlton Fruit Co., Inc.*, 84 B.R. 810, 812 (Bankr. M.D. Fla. 1988) (stating that certain deficiencies in the seller's notice do not invalidate the seller's clear intent to preserve rights under PACA); *In re Superior Tomato-Avocado, Ltd.*, 481 B.R. 866, 873 (Bankr. W.D. Tex. 2012) (finding that the notice

requirements under PACA need only be substantially complied with for a seller to preserve its rights).

The statute does not address individual officer, director, or shareholder liability. However, the Third Circuit, along with other circuits, has held that individual officers and shareholders in a position to control payment out of funds received from the sale of perishable agricultural commodities to PACA suppliers may be held personally liable for the debt. *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 421 (3d Cir. 2005); *accord Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 705-06 (2d Cir. 2007); *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.,* 307 F.3d 666, 669 (7th Cir. 2002); *Golman-Hayden Co., Inc. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000); *Hiller Cranberry Prods., Inc. v. Koplovsky,* 165 F.3d 1, 8-9 (1st Cir. 1999); *Sunkist Growers, Inc. v. Fisher,* 104 F.3d 280, 282-83 (9th Cir. 1997); *Bronia, Inc. v. Ho*, 873 F. Supp. 854, 860-61 (S.D.N.Y. 1995); *Morris Okun, Inc. v. Harry Zimmerman, Inc.,* 814 F. Supp. 346, 348-50 (S.D.N.Y. 1993). Common law breach of trust principles justify individual liability under these circumstances. *Weis-Buy Servs., Inc.*, 411 F.3d at 421. But, individual liability may only be imposed upon those individuals who "had the authority to direct the control of (*i.e.,* manage) PACA assets held in trust for the producers." *Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.,* 623 F.3d 163, 169 (3d Cir. 2010). The test for whether an individual is in a position to control the disposition of PACA trust assets is fact sensitive. *Id.* As explained by the Third Circuit, this test

> calls on courts to: 1) determine whether an individual holds a position that suggests a possible fiduciary duty to preserve the PACA trust assets (*e.g.,* officer, director, and/or controlling shareholder); and 2) assess whether that individual's involvement with the corporation establishes that she was *actually* able to control the PACA trust assets at issue. The ability to control is core. A formal title alone is insufficient—especially when faced with a

11

> small, "mom and pop" corporation . . . where formalities may be less
> meaningful.

*Id.* at 172 (footnote omitted).

### *The Validity of the Assignment of the PACA Trust Claim from Krisp-Pak to Alliance*

#### *1.   The Assignment of Judgment is Valid*

As a threshold matter, Defendant argues that Alliance lacks standing to collect the PACA

Debt from Defendant.  Defendant contends that Alliance failed to prove a valid assignment of the

Debt from Krisp-Pak to it, and that even if the assignment is valid, Alliance lacks standing to assert a

PACA claim against Defendant because Alliance is not a licensed supplier under PACA.

Here, the Execution Order clearly transferred the "rights and credits" of Krisp-Pak against

GFP to Alliance and authorized Alliance to "liquidate the rights and credits in appropriate

proceedings."  (Execution Order, Trial Ex. P-3).  The Execution Order, as well as the corresponding

default judgment, are both valid and binding on Defendant in this action, and this Court must give

them full faith and credit.  *See In re Knapper*, 407 F.3d 573, 582 (3d Cir. 2005) (noting that the

*Rooker-Feldman* doctrine prevents federal courts from sitting as appellate courts to review state court

judgments).  The fact that Defendant chose not to defend himself in connection with the state court

action does not render the state court default judgment or Execution Order invalid.  *See In re

Sabertooth,* 443 B.R. 671, 683 (Bankr. E.D. Pa. 2011) (stating that the *Rooker-Feldman* doctrine

applies to all judgments by a state court, including default judgments and judgments by

confession.).

That said, the state court's assignment of the claim to Alliance does not conclusively establish

Alliance's right to obtain a non-dischargeable judgment against Defendant in bankruptcy.  It simply

establishes the validity of the assignment of the judgment.  Ultimately, it is up to this Court to

determine the effect of the Execution Order in the context of a non-dischargeability claim under

Bankruptcy Code. *See Graham v. Internal Revenue Serv. (In re Graham),* 973 F.2d 1089, 1095

(3d Cir. 1992). In other words, just because Alliance has a valid judgment against Defendant does

not mean that the judgment is non-dischargeable. This Court must examine the judgment in the

context of Section 523(a)(4) to reach a conclusion on non-dischargeability.

### 2. *Claims and Interests to a PACA Trust are Assignable*

The limited issue of whether a creditor can assign a produce supplier's interest in a PACA

trust for purposes of determining the non-dischargeability of a debt to the assignee is an issue of first

impression in this Circuit. Defendant, without any convincing authority, asserts that beneficiary

interests and claims to a PACA trust are not assignable to third-party non-suppliers, like Alliance.

This Court disagrees. Although no case law is directly on point, several principles support the

conclusion that PACA trust interests are freely assignable. First, general trust law principles govern

PACA unless "they conflict with the language of [the statute], the clear intent of Congress in enacting

the statute, or the accompanying regulations." *Pacific Int'l Mktg., Inc. v. A & B Produce, Inc.*, 462

F.3d 279, 283-85 (3d Cir. 2006). Here, Defendant fails to point to any provision in PACA or the

applicable regulations that prohibit assignment of a producer's interest in a PACA trust. The free

assignability of a PACA trust interest does not conflict with congressional intent in enacting the

statute, nor does this Court see a conflict with the accompanying regulations.

The overarching goal of PACA, and particularly the 1984 trust provision, 7 U.S.C.

§ 499e(c), is to protect the financial well-being of produce suppliers, who are "vulnerable to the

practices of financially irresponsible buyers." *Idahoan Fresh*, 157 F.3d at 199; *see also Am.*

*Banana Co.*, 362 F.3d at 37. Assignability is an important benefit to suppliers, and neither PACA

nor its regulations expressly or impliedly disclaim it. In fact, the entire purpose behind PACA—

ensuring payment to sellers to protect them from financially irresponsible buyers—supports the

ability to assign. Since assignment is neither expressly nor impliedly prohibited by PACA or its regulations, and because no conflict exists regarding congressional intent, traditional principles of trust law control the assignability issue.

When analyzing PACA, courts have also looked to the Restatement of Trusts for general principles of trust law. *See, e.g.*, *Consumers Produce Co. Inc.*, 16 F.3d at 1380; *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 595-96 (4th Cir. 2010); *Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc.*, 188 F. Supp. 3d 1097, 1110-11 (D.N.M. 2016). Section 51 of the Restatement of Trusts substantially supports the free assignability of trust interests. It states: "[e]xcept as provided in Chapter 12 [not applicable here], a beneficiary of a trust can transfer his or her beneficial interest during life to the same extent as a similar legal interest." RESTATEMENT (THIRD) OF TRUSTS § 51 (2003). Trust interests are similar to contractual rights and the rights of judgment creditors in that holders of such interests enjoy the right to freely assign their rights under state law. *See* N.J.S.A. § 2A:25-1 (contracts and judgments are freely assignable in New Jersey); *see also Kimball Int'l, Inc. v. Northfield Metal Prod.*, 334 N.J. Super. 596, 612 (App. Div. 2000) (observing that N.J.S.A. § 2A:25-1 has been broadly construed). Indeed, the free assignability of rights is a staple of modern contract law. *See* RESTATEMENT (SECOND) OF CONTRACTS § 317 cmt. c (1981) (observing that "the historic common-law rule that a chose in action could not be assigned has largely disappeared"). Thus, general trust principles under New Jersey state law also support a finding that PACA trust interests and claims are freely assignable.

Similarly, bankruptcy principles generally do not prohibit the assignment of non-dischargeable claims. Indeed, the Federal Rules of Bankruptcy Procedure expressly recognize assignment of claims. *See* Fed. R. Bankr. P. 3001(e). With respect to other comparable sections of the Bankruptcy Code, courts have found that creditors can assign certain non-dischargeable

claims to third parties.  For example, the Sixth, Seventh, and Ninth Circuits have all held that assignees of loans and promissory notes may sue debtors for an exception to dischargeability pursuant to 11 U.S.C. § 523(a)(2).  *See In re Pazdzierz*, 718 F.3d 582, 590 (6th Cir. 2013) (holding that an assignee could pursue exception to discharge based on assignor's reliance on materially false financial statements); *Boyajian v. New Falls Corp. (In re Boyajian),* 564 F.3d 1088, 1091 (9th Cir. 2009) ("Congress was undoubtedly aware that under general principles of assignment law an assignee steps into the shoes of the assignor."); *In re Meyer*, 120 F.3d 66, 70 (7th Cir. 1997) ("[T]he very reason that the institution of assignment exists is to enable Creditor to transfer its rights against Debtor . . . to Assignee . . . .").  So generally, as long as a party's interest is assignable under non-bankruptcy law, the Bankruptcy Code does not prohibit the assignment.

Accordingly, this Court finds that the assignment of Krisp-Pak's claim and interest in the PACA trust to Alliance is valid and permissible under both PACA and the Bankruptcy Code.  Alliance, therefore, has standing in this Court to bring its non-dischargeability action against Defendant as an assignee of Krisp-Pak's claim and holder of a beneficiary interest in the PACA trust.

### *Non-Dischargeability of the PACA Debt Under Section 523(a)(4)*

Section 523(a)(4) of the Bankruptcy Code provides that a discharge under Section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  In order to except a debt from discharge under Section 523(a)(4) for fraud or defalcation in a fiduciary capacity, a plaintiff must prove the existence of "(i) a fiduciary relationship and (ii) that a fraud or defalcation occurred while the [debtor] acted in a fiduciary capacity."  *JP Morgan Chase Bank v. Tamis (In re Tamis)*, 398 B.R. 124, 130 (Bankr. D.N.J. 2008).

A fiduciary relationship is often "limited to instances involving express or technical trusts." *New Jersey v. Kaczynski (In re Kaczynski)*, 188 B.R. 770, 773 (Bankr. D.N.J. 1995). An express trust is established when three requirements are met: (1) there is a declaration of trust; (2) there is a clearly defined trust *res*; and (3) there is an intent to create a trust relationship. *See id.* at 774. The definition and scope of technical trusts are a little more difficult to determine. *See id.* "Some courts have determined that technical trusts for the purposes of § 523(a)(4) can be created by state statutes." *Id.* (citing *In re Librandi*, 183 B.R. 379, 382 (M.D. Pa. 1995)). "Other courts have found that state common law can create the requisite fiduciary relationship." *Id.* (citing *Librandi*, 183 B.R. at 382-83). However, "[n]otwithstanding the differences in the means of establishing these two types of trusts, the scope of technical and express trusts is 'not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law.'" *Id.* (citing *Librandi*, 183 B.R. at 382). Several courts have held that PACA trusts satisfy either express or technical trust requirements for purposes of Section 523(a)(4). *See, e.g.*, *In re Lundgren*, 503 B.R. 717, 722 (Bankr. W.D. Wis. 2013); *E. Armata, Inc. v. Parra (In re Parra)*, 412 B.R. 99, 105 (Bankr. E.D.N.Y. 2009); *A.J. Rinella & Co., Inc. v. Bartlett (In re Bartlett),* 397 B.R. 610, 620 (Bankr. D. Mass. 2008); *KGB Int'l, Inc. v. Watford (In re Watford)*, 374 B.R. 184, 190 (Bankr. M.D.N.C. 2007); *N.P. Deoudes, Inc. v. Snyder (In re Snyder)*, 184 B.R. 473, 474-75 (D. Md. 1995); *Nuchief Sales, Inc. v. Harper (In re Harper)*, 150 B.R. 416, 418-19 (Bankr. E.D. Tenn. 1993); *but see In re McCue,* 324 B.R. 389, 392-93 (Bankr. M.D. Fla. 2005) (holding that the plaintiffs could not prove the existence of an express or technical trust because a PACA *res* is not a segregated trust *res*). This Court will follow the majority viewpoint that PACA establishes a trust.

The United States Supreme Court in *Bullock v. Bankchampaign, N.A.* interpreted the term

"defalcation" to mean "knowledge of, or gross recklessness in respect to, the improper nature of the

relevant fiduciary behavior." *Bullock v. Bankchampaign, N.A.*, 133 S.Ct. 1754, 1757 (2013). The

Supreme Court held:

> where the conduct at issue does not involve bad faith, moral turpitude,
> or other immoral conduct, the term requires an intentional wrong. We
> include as intentional not only conduct that the fiduciary knows is
> improper but also reckless conduct of the kind that the criminal law
> often treats as the equivalent. Thus, we include reckless conduct of the
> kind set forth in the Model Penal Code. Where actual knowledge of
> wrongdoing is lacking, we consider conduct as equivalent if the
> fiduciary "consciously disregards" (or is willfully blind to) "a
> substantial and unjustifiable risk" that his conduct will turn out to
> violate a fiduciary duty. That risk "must be of such a nature and degree
> that, considering the nature and purpose of the actor's conduct and the
> circumstances known to him, its disregard involves a gross deviation
> from the standard of conduct that a law-abiding person would observe
> in the actor's situation."

*Id.* at 1759-60 (internal citations omitted).

Accordingly, in order for the Court to find the Debt non-dischargeable, Alliance must prove

that: (1) a PACA trust existed between GFP and Krisp-Pak; (2) Defendant owed a fiduciary duty to

Krisp-Pak; and (3) Defendant committed a fraud or defalcation in violation of his fiduciary duty to

Krisp-Pak. *See JP Morgan Chase Bank*, 398 B.R. at 130.

### *A PACA Trust Existed between GFP and Krisp-Pak*

Defendant contends that a PACA trust was never formed because Plaintiff did not produce

evidence that Krisp-Pak was a PACA-licensed supplier or that it preserved its rights under PACA by

meeting the notice requirement under 7 U.S.C. § 499e(c)(3), (4) and 7 C.F.R. § 46.46(c), (f).

Defendant also testified that the amount of the Debt asserted by Alliance is inaccurate. However,

the factual record belies all of these contentions. Other than bald assertions, Defendant fails to point

to a scintilla of evidence to support his position.  On the other hand, Alliance provided evidence

supporting the existence of a PACA trust between GFP and Krisp-Pak.

Edward Wright, Alliance's corporate witness and long-term employee of Alliance, testified

that he was very familiar with Krisp-Pak and its long-term business relationship with Alliance.  He

further testified the Krisp-Pak was in fact a licensed PACA wholesale dealer during the course of that

relationship.  Further, Alliance produced Krisp-Pak's invoices to GFP, which specifically reference

PACA and also contain the necessary statutory language to satisfy PACA's notice requirements.

(Invoices, Trial Ex. P-4).  Specifically, the invoices state:

> [t]he perishable agricultural commodities listed on this invoice are
> sold subject to the statutory trust authorized by Section 5(c) of the
> Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499 (e)(c)).
> The seller of these commodities retains a trust claim over these
> commodities, all inventories of food or other products derived from
> these commodities and any receivables or proceeds from the sale of
> these commodities until full payment is received.

(Invoices, Trial Ex. P-4).  These invoices also support the amount due and owing on the Debt.  (*Id.*).

Defendant offered no evidence to refute Mr. Wright's testimony that Krisp-Pak was PACA-licensed.

Likewise, Defendant produced no evidence disputing the validity or accuracy of the invoices or to

support his self-serving testimony that he made payments to satisfy part of the Debt.  To the contrary,

Defendant acknowledges GFP received the invoices with the PACA language on them.  Thus, this

Court finds that Alliance has proven by a preponderance of the evidence that Krisp-Pak was a PACA-

licensed distributor and that Defendant received notice of the same.  Therefore, a PACA trust between

GFP and Krisp-Pak formed the moment GFP received produce from Krisp-Pak.  *See* 7 U.S.C. §

499e(c)(2); *Morris Okun, Inc.*, 814 F. Supp. at 348.  At that point, GFP owed a fiduciary duty to

Krisp-Pak to hold any inventory or proceeds from the sales of the produce purchased from Krisp-Pak

in trust until Krisp-Pak received full payment.  *See Morris Okun, Inc.*, 814 F. Supp. at 348 ("[T]he

trust arises from the moment perishable goods are delivered by the seller.").

While Defendant never asserted a position regarding whether a PACA trust qualifies under

Section 523(a)(4), this Court concurs with the majority of cases previously discussed, which hold that

a PACA trust satisfies the fiduciary requirement in Section 523(a)(4).  As the United States

Bankruptcy Court for the Western District of Wisconsin recognized in *Lundgren*, "[t]he majority

view reflects the commercial realities embodied in both the PACA statute and its implementing

regulations."  *In re Lundgren*, 503 B.R. at 722.  Namely, there is a "disparity of knowledge and

power" between the buyer and supplier of produce that "gives the 'former a position of ascendancy

over the latter' sufficient to create implied fiduciary capacities in Defendant for purposes of

[S]ection 523(a)(4)."  *Id.* (quoting H.R. REP. NO. 98–543, at 3 (1983), *reprinted in* 1984

U.S.C.C.A.N. 405, 506).

### *Defendant Owed a Fiduciary Duty Arising from the PACA Trust*

As previously mentioned, the PACA trust relationship extends to individual defendants who

exercise actual control over the dissipation of trust assets.  *Weis-Buy Servs., Inc.*, 411 F.3d at 421.

This factual inquiry focuses on two factors: "(1) . . . whether an individual holds a position that

suggests a possible fiduciary duty to preserve the PACA trust assets (*e.g.*, officer, director, and/or

controlling shareholder); and (2) . . . whether that individual's involvement with the corporation

establishes that [he or] she was actually able to control the PACA trust assets at issue."  *In re*

*Yerges*, No. 13-10813-7, 2014 WL 1803395, at *4 (Bankr. W.D. Wis. May 6, 2014) (citing *Bear*

*Mountain Orchards, Inc.,* 623 F.3d at 172).

Here, Defendant admitted the facts necessary to prove both factors.  First, Defendant admitted

that he was the sole officer, owner and shareholder of GFP, thus satisfying the position/title

requirement.  Second, Defendant admitted that he possessed sole check writing authority for GFP and was responsible for prioritizing how the proceeds from produce sales would be distributed. Accordingly, Defendant's own testimony proves that he was primarily responsible for the day-to-day operations of GFP, including the sole control of GFP's bank account.  Defendant, therefore, owed his own fiduciary duty to Krisp-Pak under the PACA trust.

### *Defendant Consciously Disregarded His Fiduciary Duties Under the PACA Trust*

Having found that Defendant is a fiduciary under PACA, the next step is to determine whether Defendant committed a defalcation.  *See In re Kaczynski*, 188 B.R. at 773.  In order to satisfy the defalcation requirement, Plaintiff must demonstrate that Defendant had actual knowledge of the breach or that he consciously disregarded a substantial or unjustifiable risk. *Bullock*, 133 S. Ct. at 1759.

Applying *Bullock* to this case, it is clear that Defendant knowingly or recklessly failed to observe the requirements of PACA by dissipating trust assets.  This Court infers from Defendant's thirty years of experience in the produce industry, as well as his challenge as to whether Krisp-Pak or Alliance were PACA-licensed, that Defendant is familiar with the requirements of PACA.  Despite this knowledge, Defendant admitted to violating PACA by utilizing sale proceeds to pay for other business expenses.  Even if Defendant was unaware of PACA's requirements, he knew that using the money—derived from the sale of the produce sold by Krisp-Pak—to pay his other business expenses instead of Krisp-Pak's invoices would deprive Krisp-Pak of payment.  Defendant controlled GFP's financial choices and knowingly chose not to pay Krisp-Pak.

Thus, the Court finds that Defendant intentionally violated PACA.  Even assuming, *arguendo*, that Defendant did not intentionally violate PACA, his actions were in reckless disregard of his fiduciary obligations.  Based upon these facts, the Court finds that Debtor committed a defalcation by

intentionally or recklessly disregarding his fiduciary duties as required by PACA and defined in *Bullock*.

### ***Request for Counsel Fees***

Lastly, Defendant's Complaint requests an award of counsel fees and cost of suit. (Docket No. 1, at 5, ¶ 2). PACA allows parties to recover attorney's fees and costs if provided for in the contract. *Spectrum Produce Distrib., Inc. v. Fresh Mktg., Inc.*, No. CIV. 11-06368 JBS, 2012 WL 2369367, at *2 (D.N.J. June 20, 2012) (citing *Pacific Intern. Mktg., Inc. v. A & B Produce, Inc.*, 462 F.3d 279, 286 (3d Cir. 2006); *Country Best v. Christopher Ranch, LLC*, 361 F.3d 629, 632-33 (11th Cir. 2004)). Language contained in a supplier's invoices can be sufficient to create a contractual obligation for fees and costs. *Spectrum Produce Distrib., Inc.*, 2012 WL 2369367, at *2. Here, Krisp-Pak's invoices state that "attorney's fees necessary to collect any balance owed hereunder shall be considered sums owing in connection with this transaction under the PACA trust." (Invoices, Trial Ex. P-4). GFP agreed to this term by accepting the produce from Krisp-Pak. Since the contract between Krisp-Pak and GFP permits attorney's fees, Alliance is entitled to an award of attorney's fees and costs of suit.

### CONCLUSION

For the forgoing reasons, judgment is entered in favor of Alliance and against Defendant in the amount of $292,444.20. That amount is and shall be deemed non-dischargeable pursuant to Section 523(a)(4) of the Bankruptcy Code. Additionally, judgment is entered in favor of Alliance and against Defendant for reasonable costs and attorney's fees. Those costs and fees, as further set by the Court, are and shall be non-dischargeable under Section 523(a)(4) of the Code. This Court will issue an appropriate Order entering judgment in the amount of $292,444.20 as non-dischargeable and rendering judgment that attorney's fees and costs, in an amount to be

established, are also non-dischargeable.  The only open issue will be the amount of those attorney's

fees and costs.  Alliance shall file, within thirty days of the date of the Order memorializing this

Opinion, an affidavit of services rendered with the amount sought for attorney's fees and costs

along with a proposed form of order on notice to Defendant and Defendant's counsel.  This Court

will enter a subsequent Order establishing the amount of attorney's fees and costs that are non-

dischargeable consistent with this decision.  To the extent Alliance fails to file the affidavit of

services rendered and amount sought for attorney's fees and costs within thirty days of the date of

the Order memorializing this Opinion, then Alliance shall be deemed to have waived any

attorney's fees and costs derived from this decision.

DATED: October 16, 2017

_Stacey L. Meisel_
Honorable Stacey L. Meisel
United States Bankruptcy Judge